## Bauersfeld v. Shadyside Hospital

*Henry W. Fulton, Jr.*, for plaintiff.
*David L. McClenahan*, for defendant.

SMITH, JR., J., July 24, 1974.—We have before us

for our consideration the request of S. Richard Bauersfeld (hereinafter Bauersfield), for a preliminary injunction against defendant, Shadyside Hospital (hereinafter hospital), prohibiting the hospital from discriminating against him and excluding him from the use of its facilities to perform vascular angiography applications in accordance with his staff appointment.

Bauersfeld, 52 years of age, graduated from medical school in 1944 and immediately thereafter entered into one year of medical internship. Subsequently, he studied and practiced internal medicine and in 1967 he was on the staff of Children's Hospital, Pittsburgh, Pa., where he specialized in pediatric cardiology. From the time of his graduation from medical school in 1944 until 1967, Bauersfeld continually practiced and studied medicine in an ever narrowing field of specialty. Because of his preeminence in the field of cardiology, Bauersfeld was invited by the board of trustees (hereinafter trustees) of the hospital to accept an appointment on the medical staff of the hospital and to plan and establish a cardiac catheterization lab. He accepted the invitation and in doing so left Children's Hospital* to become a member of the medical staff of defendant hospital. Having joined the hospital in 1967, Bauersfeld undertook the planning and creation of the cardiac catheterization lab which under his direction was able to begin functioning in 1968. From 1968 through June 30, 1974, Bauersfeld was the director of the lab. From 1971, Bauersfeld limited his medical practice to the specialty of vascular angiography. The trustees of the hospital granted Bauersfeld a position on the medical staff known as Type I which carries with it unrestricted privileges in the limited specialty of vascular angiography. The trustees in May of 1974 reappointed him for another

---

* Bauersfeld testified that Children's Hospital extends him courtesy privileges but he has not exercised them.

term of one year to begin and take effect on July 1, 1974.

The hospital stipulated that Bauersfeld is eminently qualified in the specialty of vascular angiography and this stipulation was supported by the sworn opinions of Doctors Pandit, Tuttle, Wholey and Watson as well as Administrator Lebo.

The hospital is a nonprofit corporation existing by virtue of an Act of the General Assembly of this Commonwealth approved April 4, 1866. Its corporate purpose is the establishment, maintenance and management of a hospital for the reception, care and medical and surgical treatment of the sick and injured by qualified physicians. The hospital also has ancillary powers such as training resident physicians, interns and nurses and the conducting of research. The hospital is not a teaching institution in the sense that it is associated with a medical school and provides instruction to medical students. The governing body of the hospital is its trustees. The administrative functions of the hospital are performed by an administrator and his staff. The administrator is the executive vice president of the hospital and is an ex-officio member of its trustees. The annual budget of the hospital is approximately $20,000,000, most of which comes from solicitations, gifts and charges for services rendered. However, a substantial amount of money received by the hospital is in the nature of Hill-Burton Funds and general funding from the United States Government and the Commonwealth of Pennsylvania. The total amount of money received by the hospital from tax funds is in the millions annually.

From 1968, when the lab was initiated, until 1974 it began to serve an ever increasing demand for its highly technical medical services. In 1971, Bauersfeld

took on an assistant in the person of Indravadan N. Pandit (hereinafter Pandit). Pandit is a native of India and a graduate from one of its medical schools. He studied in the specialty of internal medicine. He came to the United States and, in 1971, he was associated with Bauersfeld at the hospital. He ultimately was made a member of the medical staff with privileges limited to the specialty of vascular angiography. Technically, Pandit was an employee of and paid by Bauersfeld. The only two members of the hospital medical staff who were granted privileges to practice the specialty of vascular angiography by the trustees were Bauersfeld and Pandit.

In February of 1974, Lebo, the hospital administrator, informed Bauersfeld that his contract with the hospital as director of the cardiac catheterization lab was to be terminated effective June 30, 1974. There is no evidence that the administrator or any one associated with the administrative staff or the medical director indicated that upon termination of Bauersfeld's directorship he would be prohibited from practicing his specialty at the hospital with the full use of its equipment and facilities. Negotiations continued between Bauersfeld and the administrator regarding the directorship up to April 10, 1974, at which time the administrator definitely indicated that the directorship would not be renewed. Thereafter, negotiations ceased.

Although the administrator had informed Bauersfeld in February of 1974 that he was terminating the directorship and in spite of the fact that negotiations with Bauersfeld were terminated on April 10, 1974, by the administrator, the trustees, nevertheless, in May of 1974 renewed Bauersfeld's appointment to the medical staff. This appointment was classified as Type

I with unrestricted privileges in the specialty of vascular angiography and was for a period of one year commencing with July 1, 1974.

From and after July 1, 1974, the administrator and the medical director of the hospital refused to permit Bauersfeld the use of the facilities and supporting employes of the cardiac catheterization lab.

From and about July 1, 1974, the administrator and medical director of the hospital effectively denied to Bauersfeld the appointment to the medical staff granted him by the hospital's trustees in May of 1974. The administrator and the medical director advised hospital employes, including Pandit, that the lab's facilities were to be denied to Bauersfeld. Employes were advised that if they helped, aided or assisted Bauersfeld in the performance of his medical staff privileges in his specialty of vascular angiography that their position with the hospital would be in jeopardy. James Flynn, an employe of the hospital, was told by Pandit that he could not assist Bauersfeld as requested and that if he did, he would be dismissed. A letter dated July 1, 1974, addressed to Pandit by the Medical Director advised and instructed Pandit that he is ". . . the only physician authorized to perform procedures in either the old or new Cardiopulmonary Laboratory on or after July 1, 1974 until further notice." Although the activity and conduct of the administrator and the medical director are in direct contravention to the action of the Hospital's governing board, the trustees, their action effectively stopped Bauersfeld from practicing in the hospital.

In order to avail himself of the appointment to the medical staff granted him by the trustees in May of 1974, Bauersfeld testified that it was essential that he have the use of the facilities and supporting employes of the cardiac catheterization lab. William G. Watson,

M. D., a witness called on behalf of defendant, testified that Bauersfeld could not practice his specialty without making use of the lab facilities.

In denying Bauersfeld the right to use the hospital facilities in order to practice the specialized field of medicine which the trustees granted him permission to practice, the administrator and the medical director have established for him a solitary position in regard to the hospital medical staff. Bauersfeld is the only doctor authorized to practice his medical specialty and at the same time denied the absolutely essential facilities with which to carry on the practice. No other doctor on the hospital staff finds himself in such an inconsistent position. There is not a radiologist on the medical staff who is denied the facilities of the radiology lab, nor a urologist who is denied the facilities maintained by the hospital for the practice of urology, nor a surgeon denied the facilities maintained to carry out the practice of medicine for which he has been admitted to the staff.

Beginning on or about July 1, 1974, the administrator designated Doctor Indravadan N. Pandit as the interim or acting director of the cardiac catheterization lab. The agreement was that Pandit was to perform the medical services for the patients who needed the facilities of the lab and that he was to charge for these services the same fees which were charged by Bauersfeld. Hospital guaranteed to Pandit that he would have a minimum income of $50,000 per year and all fees in excess of $50,000 were to be turned over by Pandit to the hospital. To effectuate this understanding Pandit made an assignment of his professional fees to the hospital. The administrator estimated that the hospital would receive approximately 100 to 150 thousand dollars a year from fees generated by Pandit as a doctor in excess of the $50,000 that

Pandit was to keep for himself. The administrator also testified that it was contemplated that Pandit would have an assistant medical doctor to aid him and that this medical doctor would be paid between $40,000 to $50,000 from these fees. The administrator also testified that, in the event Pandit was made the permanent director of the lab, he would receive a substantial increase in the amount that he was permitted to retain from the fees which he generated as the director of the lab.

For the use of the laboratory facilities, the physical plant and the supporting employes, such as nurses and technicians, the hospital charges a fee directly to the patient. Hence, from July 1, 1974, the administrator not only contemplated that the hospital should receive a fee for the use of the lab facilities and supporting employes but also a share of the medical fees generated by Pandit.

The effect on Bauersfeld of being denied the right to practice the medical specialty as a member of the staff of the hospital granted him by the trustees is to: (1) Deny him the opportunity to practice the very limited and highly specialized area of medicine in which he has been specializing for the past seven years. He has no other hospital staff appointments or a private medical practice. Moreover, there is no immediate opportunity for him to obtain such an appointment. This, coupled with the fact that the cost of privately obtaining the equipment would be prohibitive, creates an effective and almost insurmountable barrier to Bauersfeld's continuation of his practice in the field of vascular angiography. If he is not permitted to continue his practice, his skills will dull and his ability to perform the intricate procedures of his profession will be impaired. (2) Because Bauersfeld has from the date of his graduation from medical

school continued to narrow the field of his specialty, he is presently unable to return to the field of general practice and, because his appointment by the trustees limits him to the practice of vascular angiography, he cannot engage in any medical practice at the hospital; thus, Bauersfeld will be denied the opportunity to make a living as a doctor. He will suffer severe financial losses. (3) Because Bauersfeld enjoyed an excellent reputation in his specialty, he has had referred to him numerous patients by other members of the medical staff of the hospital as well as by doctors who were not on the hospital staff. Because of the impairment and impediment caused by the administrator and the medical director, he will not be able to render the care to those patients referred to him by other doctors. This will result in a lowering of his professional stature.

The motivation behind the change in the directorship of the lab and the subsequent denial to Bauersfeld of the lab's facilities was not one of increasing or improving the medical care available to the patients of the hospital. All of the medical witnesses testified and the hospital stipulated to Bauersfeld's outstanding qualifications as a doctor in the field of vascular angiography. The hospital admits that it retained Bauersfeld for the purpose of establishing the lab and one medical witness has testified that the lab, as established, is one of the nation's best. Pandit, the man who has been selected as the acting or interim director, was an employe or an associate of Bauersfeld and is a person who has not had the extensive background in the field of vascular angiography as has Bauersfeld. Commendably, Pandit admitted that there was one procedure that was to be performed in the lab which he had never done before and in order to do it without jeopardizing the patient, he called upon

Doctor Bauersfeld for instructions and assistance. If the hospital administration was merely interested in changing its director of the lab and is interested in having an assistant or associate help and aid in the caseload, then the person most logical and best suited to do so would be, as Pandit testified, Bauersfeld. Whatever the true motivation of the administrative staff is in denying Bauersfeld the use of the lab facilities, it was not the desire to improve the medical care to the patients. There is nothing in the totality of the evidence presented from which we could glean a modicum of facts to show that improvement of patient care would result from or was the polestar of the administrator's action.

The denial of the lab facilities to Bauersfeld would not have any substantial financial benefit to the patients of the hospital. The administrator testified that if the lab performed the same number of procedures that it did under Bauersfeld, after taking into consideration the amount of money that Pandit was to keep, the hospital would have somewhere between $100,000 and $150,000 as its share of the professional medical fees generated by Pandit's practice of medicine. Subsequently, the administrator admitted that Pandit would need an assistant and that this assistant would be paid the sum of $40,000 to $50,000 per year, thus reducing the net amount available to the hospital to aid in its overall administrative expenses. If Pandit's salary is increased if and when he should be made the permanent director, as the administrator testified that it would, this would again reduce the net amount to the hospital When it is considered that the annual budget of the hospital is substantially in excess of $20,000,000 per year, the amount that the administrator conjectures and speculates that can be saved

becomes de minimis. We find that economics is a spurious, not a real, consideration of the administration in denying Bauersfeld the right to exercise the medical staff privileges granted by the trustees.

Based upon the record presently before us we find that: (1) equity has jurisdiction of the subject matter and of the parties; (2) the hospital is a quasi-public institution; (3) Bauersfeld will suffer permanent and irreparable harm unless the preliminary injunction prayed for be granted; (4) the granting of the preliminary injunction as prayed for will in no way jeopardize or interfere with a high quality of medical health care for the patients of the hospital who require the services of the cardiac catheterization lab; (5) the action of the administrator and the medical director in denying to Bauersfeld the opportunity to use the facilities of the lab is directly in conflict with the action of the trustees in approving his appointment as a member of the medical staff, Type I, unrestricted privileges, limited to the specialized field of vascular angiography and that, because of the higher authority of the trustees, the conduct of the administrator and the medical director cannot be allowed to set aside their appointment; (6) the action of the administrator and medical director of the hospital has the de facto effect of denying Bauersfeld the right to practice medicine within his specialty as he was licensed by the Commonwealth of Pennsylvania to do, contrary to the Constitutions and laws of the United States of America and the Commonwealth of Pennsylvania; (7) the conduct of the administrator and the medical director in denying Bauersfeld the opportunity to care for his patients by denying him access to the lab was arbitrary and capricious and contrary to the very purpose for which the hospital was incorporated; (8)

the right of Bauersfeld to preliminary injunctive relief is clear; (9) there is an urgent necessity to avoid injury which cannot be compensated for by damages; and, (10) greater injury will be done to all concerned by refusing the preliminary injunction rather than granting it.

For the reasons set forth herein, we enter the following

## DECREE

And now, to wit, July 24, 1974, it is hereby adjudged and decreed that:

1. The Shadyside Hospital, acting through its servants, agents or employes be and is hereby enjoined and prohibited from denying to S. Richard Bauersfeld, M. D., the right granted to him by the hospital Board of Trustees as a member of the medical staff, Type I, with unrestricted privileges in the field of vascular angiography;

2. The Shadyside Hospital be and is hereby enjoined and prohibited from denying to S. Richard Bauersfeld, M. D., the reasonable use of the facilities of the hospital that are necessary in order that he may fully enjoy the medical staff privileges which the hospital's Board of Trustees has seen fit to bestow upon him;

3. This court shall retain jurisdiction of the subject matter and the parties to this litigation in order to see that this preliminary injunction is given full meaning and effect.

This injunction to begin and take effect upon the plaintiff, S. Richard Bauersfeld, M. D., posting a bond in the sum of $10,000 sec. leg. et sec. reg.